LANSING NATIONAL BANK *v.* COLEMAN.

1. CONTRACTS—AGREEMENT TO ANSWER FOR ANOTHER'S DEFAULT
—CONSIDERATION.
    A bank stockholder's written agreement to make good to the
    bank, out of "dividends to be made," an amount alleged to
    have been stolen by his son, does not imply such an extension
    of time as will supply the legal consideration necessary to
    support the promise; nor, in the absence of any agreement,
    will nonaction by the directors with respect to the institu-
    tion of proceedings against the son have that effect. GRANT,
    C. J., and MOORE, J., dissenting.

2. SAME—THEFT—BURDEN OF PROOF—HEARSAY.
    A bank cashier who seeks to avoid his written agreement
    to make good to the bank a deficiency by showing that such
    agreement was, what does not appear upon its face, an
    undertaking to answer for the theft of his son, the teller,
    and without consideration, does not sustain the burden of
    proof which rests upon him to show the fact by evidence
    that he informed the directors, at the time the agreement
    was given, that his son had told him that he stole the
    money; such information being mere hearsay. MONTGOMERY,
    J., dissenting.

Error to Ingham; Wisner, J., presiding. Submitted
November 4, 1897. Decided May 24, 1898.

*Assumpsit* by the Lansing National Bank against
Merritt L. Coleman for moneys had and received. From
a judgment for defendant, plaintiff brings error. Re-
versed.

Defendant admits his indebtedness to plaintiff in the
sum of $600, for the recovery of which this suit is brought.
He claims a set-off of $690, due him for declared divi-
dends as a stockholder of the plaintiff. To this defense
plaintiff replies by interposing the written agreement of

the defendant that any dividends due him should be paid as therein provided. To this agreement he replies that it was without consideration, and, therefore, not binding upon him.

Defendant was plaintiff's cashier during its entire existence, from 1872 to 1892. He gave a bond, conditioned for the faithful discharge of his duties as cashier, and to account for and pay over all moneys that came into his hands as such cashier. Among the assets of the bank when it went into liquidation was found the following note:

"$2,000.        LANSING, MICH., October 3, 1891.
    "Ninety days after date we promise to pay to the order of B. F. Simons two thousand dollars, at the Lansing National Bank, for value received, with interest at ten per cent. after maturity.
                [Signed]    "E. BEMENT & SONS,
                            "A. O. BEMENT, President."

Indorsed upon its face in red ink was the following: "Duplicate. Original note lost. Copy." It was also indorsed by B. F. Simons. Defendant claimed at the time that a note of E. Bement & Sons, of a like amount, which had been discounted by the bank, was lost, and that this was given to take its place. This note was entered upon the teller's cashbook, November 14, 1891, and charged in the cash account of that day at $2,000, as an original loan. It appears that Bement & Sons had been large borrowers at the bank, and, when the statement was made to them of the loss of the note, they, without examination, assumed the statement to be true, and gave this note. In fact, they never had had such a note at the bank, and when it came due they refused payment. The bank, under the direction of defendant, brought suit upon it. Subsequently the suit was discontinued, and defendant, as cashier, gave Bement & Sons, on August 23, 1892, the following certificate:

"This certifies that the note of which the above was a copy was given by E. Bement & Sons to take the place

of one supposed to be lost. It was subsequently ascertained that the note so supposed to be lost was not lost, but paid. Therefore the makers of this note do not owe the same. It is without consideration, and is not collectible. When the affairs of the Lansing National Bank are settled up, this note is' to be canceled or surrendered to the makers.

[Signed] "M. L. COLEMAN, Cashier."

September 17th following, defendant gave to plaintiff the following agreement:

"Hon. O. M. BARNES,
            "Pt. Lansing Nat. Bk.
    "*Dear Sir:* I will pay what is known as the duplicate E. Bement & Sons note of ($2,000) two thousand dollars out of any dividends made from the remaining securities of the Lansing Nat. Bk.

"Resp. yours,
            "M. L. COLEMAN."

The defendant claims that his son, who was the bank teller, had stolen $2,000, and that he was not responsible for this theft, and that his promise to pay was void for want of consideration.

The court instructed the jury that if they should find that defendant was not able to account for this money, and that his agreement to pay was given on account of his inability to account for it, then there was a good consideration; but if they should find that it was understood that his son had stolen the money of the bank, and that the real consideration was the theft by the son, then it was void. A full statement of the testimony upon this point is essential. Mr. Barnes, the president, a witness for the plaintiff, was asked to state the circumstances under which the agreement of September 17th was given. He stated that the bank claimed $2,000 more than defendant admitted to be due; that this claim grew out of the Bement note, for which defendant had received credit upon the books; that Mr. Bement claimed that the note was not to be paid, having been given to take the place of a lost one; that defendant denied this; that the directors

insisted that that question should be disposed of, and that, "if it belonged to Mr. Bement to pay, suit should be brought by the cashier, and payment insisted on; if not, the officers of the bank should have the proof—." At this point defendant's attorney interrupted the witness, and objected to the testimony, and stated to the court that he would state the facts. He said:

"The teller of that bank, a relative of Mr. Coleman, was supposed to and charged with, by every director of that bank, having abstracted $2,000 in cash, and to have substituted a paid Bement note in its place. When E. Bement & Sons renewed the $2,000 note, they failed to take it up. The teller of the bank, instead of retiring it, permitted it to stay upon its cashbook as a claim due the bank."

After this colloquy was over, the witness continued, testifying that after the matter had been before the board of directors for some time, and after Mr. Bement had been seen by the bank officers, defendant came to him with a paper dated September 17th, and said he had found out how the matter was; that his son was at the bottom of the trouble; that he would pay the money, and that he would not prosecute Mr. Bement on the note; that as fast as his dividends came in they might be applied on it; that defendant, at witness' suggestion, put it in writing, so that he (witness) could show it to the other directors; that witness did so, and they all regarded it as satisfactory. Being afterwards recalled by the defendant, Mr. Barnes testified as follows:

"When I took this from Mr. Coleman, I knew he had credit for the Bement note, and that it was not a note he could enforce against the Bements. I did not understand when that paper was taken that Mr. W. T. Coleman had taken $2,000, and had confessed that he took it. I understood Mr. M. L. Coleman to say he had taken money, but how much was not stated. He gave this paper voluntarily. When Mr. Coleman told me the boy had stolen the money, I believed it, and this was my belief when I took this paper."

Mr. Hasty, the bookkeeper of the bank, testified that there was no record in the bank books of any note of which this Bement note was a duplicate or a renewal. Defendant was then called in his own behalf, and testified that he could not tell from the books whether this note was valid or not. Under the direction of his own attorney, he testified as follows:

"*Q.* Did you afterwards learn from an employé of the bank what was said to be the secret of that note? This is preliminary.

"*A.* I did.

"*Q.* Did you state that to the board at a board meeting?

"*A.* I did.

"*Q.* Did you ascertain from Mr. W. T. Coleman that he had substituted this note for $2,000 that he took out of the bank?

"*A.* I did.

"*Q.* Did you ascertain what it was he took out?

"*A.* He told me what he took out.

"*Q.* What was it?

"*A.* He took out $2,000 in cash.

"*Q.* State to the jury whether or not, at a board meeting of the directors of the Lansing National Bank, held thereafter, after the communication, you disclosed to them the information you had received.

"*A.* I did.

"*Q.* Did you or did you not state to them that W. T. Coleman had confessed that he had taken $2,000 in money from the bank, and substituted this note?

"*A.* I did.

"*Q.* Now state whether or not it was following that fact that this action in relation to the note of E. Bement & Sons was taken.

"*A.* It was; consented to by Mr. Barnes, and a paper prepared by Mr. Barnes."

On cross-examination he was shown the note, and testified that he secured the note himself; that it was in his handwriting; that he got it of A. O. Bement, wrote the word "Duplicate" some time afterwards, told Mr. Bement that there was a note of $2,000 that he supposed was lost, and asked him to give a duplicate; that they

were $2,000 short, and he knew a note was lost; that the note he supposed was lost was dated October 3, 1891. He was then shown a note of that date for $2,000, indorsed by A. A. Nichols, made by Bement & Sons, and testified that this was the note he thought was lost, but could not tell how he knew the note was lost. He thought it was Bement's. He admitted that he represented to Bement & Sons that the lost note was payable to the order of B. F. Simons. He then testified as follows:

" *Q.* When you went there, and took that note, you did not know that there was any original note, did you, that they had given?

"*A.* I supposed there was, sir.

" *Q.* I say you did not know it. How did you happen to date it October 3d?

"*A.* I cannot tell you how I happened to date it October 3d.

" *Q.* Well, you marked this 'Duplicate,' didn't you?

"*A.* Not at that time. I didn't think it was marked 'Duplicate.' It might have been, but I don't think so. I think, at request of Mr. Bement afterwards, that I marked the note 'Duplicate.'

" *Q.* After you had taken it?

" *A.* Yes, sir.

" *Q.* Now, you have not answered yet how you know—

" *A.* I do not know.

" *Q.* You did not know at that time, did you?

" *A.* I think I did. I think I ought to know.

" *Q.* I am not asking you whether you ought to know, but whether or not you did know, at the time you took that note, that, as a matter of fact, they owed you $2,000.

" *A.* I did not get that—whether I did know, as a matter of fact, that they owed me $2,000?

" *Q.* Did you know, at the time you took this note, that E. Bement & Sons owed your bank $2,000?

" *A.* I supposed they owed the bank $2,000.

" *Q.* What made you suppose so?

" *A.* Because there lacked $2,000 of being notes sufficient to amount to the sum that the books called for.

" *The Court:* Called for as against Mr. Bement, do you mean, or generally as against everybody?

"*A.* As against everybody.

" *Q.* Well, how did you happen to know they owed the $2,000?

"*A.* I didn't know it.

"*Q.* Then you went down there, and represented to them that they owed you $2,000 ?

"*A.* Yes, and they believed it.

"*Q.* And they believed it, and made this note ?

"*A.* Yes, sir.

"*Q.* And as a matter of fact it was not true ?

"*A.* As a matter of fact it was not true."

The jury rendered a verdict for the defendant.

*E. C. Chapin*, for appellant.

*R. A. Montgomery*, for appellee.

Grant, C. J. ( *after stating the facts* ). 1. A settlement was made between the bank and the defendant. What was settled, and what was the consideration for the settlement? The defendant had taken a note for $2,000, placed it among the assets of the bank, and had credited himself upon the books with $2,000 as loaned upon this note. In fact no loan was made, no cash paid out, no note had ever existed of which the one taken could be a duplicate. There was nothing upon the books of the bank to indicate the existence of any such note, or that Bement & Sons had ever been indebted to the bank upon such a note. Defendant had no reason to believe that the Bements had ever executed such a note, or were indebted to the bank in such a sum. If there was a shortage at that time in the cash of the bank, defendant did not then inform any of the bank officials, and give them an opportunity to investigate. Defendant, under his contract and bond, had control of the bank assets and loans. He recognized his liability for the transaction, and took this note, himself taking it, and entering it, and being alone responsible for it. It requires no argument to show that he was primarily liable to the bank. The bank had sued Bement & Sons. The suit was pending. They had executed the note. They appear to have had a valid defense. Defendant recognized it. On the strength of defendant's agreement, that suit was discontinued. Defendant recog-

nized his liability, agreed to pay, time to pay was extended, and any further investigation by the officials of the bank rendered unnecessary. Defendant was not settling a larceny committed by his son, but a transaction of his own. The fact, if so it be, that defendant informed the president and directors that his son had taken the money, did not change the situation. The statement did not bind them or the bank. They did not know whether the statement was true or false, and made no investigation. It was immaterial to the bank who had taken the money. There is no evidence to show that the bank officers understood and agreed that they would settle a theft by young Coleman. The fact that Mr. Barnes, the president, believed the statement of the defendant, did not bind the bank, or change the nature of the transaction. If defendant stated to the directors that his son had confessed that he had taken the money, and "substituted the note" for it, the statement, as a whole, was not true, for his son had nothing whatever to do with getting the note or entering it on the books, as appeared from his (defendant's) cross-examination. But this is not all. It was not true, as stated by his counsel, that Bement & Sons had failed to take up a $2,000 note, and his son, instead of retiring it, had permitted it to stay upon its cashbook as a claim due the bank. The bank, through its officers, insisted that defendant was liable. He did not deny his liability. On the contrary, he recognized it, and settled. It would be a gross injustice to permit him, years afterwards, to escape liability under a plea of theft by his son. If defendant had disputed his liability, and this dispute was compromised and settled, the compromise would have been a good consideration. 3 Am. & Eng. Enc. Law, 837. Is the settlement any less valid where he admitted his liability?

2. If, however, we assume that this settlement was made to secure the debt, default, or miscarriage of young Coleman, the defense cannot be maintained. The agreement is in writing, and answers the statute of frauds.

The agreement itself implies an extension of time, because it was to be paid out of future dividends. It was clearly understood that no proceedings to recover it were to be taken against young Coleman. None were taken. The agreement lulled the directors into nonaction against him. The settlement was voluntary. The amount was agreed upon, as well as the terms of payment. Defendant's written obligation was accepted by the bank, acted upon, rendered any investigation by the bank as to the liability for the money unnecessary, and, in short, was treated as a complete settlement, and acted upon, for nearly four years. Defendant was continued in the service of the bank. In *Bodine* v. *Morgan,* 37 N. J. Eq. 426, the defendant had given a mortgage to secure the firm for which he and his son were employed for peculations made by the two. Five years afterwards Morgan attempted to defend against the mortgage because it was obtained by duress. It was there said:

"The mortgage resulted from a voluntary agreement on the part of Morgan with the firm to secure them $5,000 for the losses which he admitted they had sustained by the fraud of himself and his son while in their employment. He took no steps to set it aside, and never even protested against it, though it had stood against his property for about four years, and consequently had been due for a year when this suit was brought."

The extension of time of payment and forbearance to bring suit against the son were sufficient consideration for the promise.

3. If proof that this obligation was given by defendant to secure a defalcation of his son would be a valid defense, defendant, upon whom is the burden of proof, has failed to establish it. Can a bank cashier avoid his written obligation by simply stating that A. or B. or C. told him that he had stolen $2,000 of the bank funds? Such a defense does not depend upon who stole,—whether he be a stranger or employé. If the position of the learned counsel for the defendant be true, then a bank cashier can

defend against his written obligation securing a deficit by coming into court years afterwards and saying: "I told the directors or president at the time I secured this deficiency that one A., a stranger, told me that he went into the bank one day and stole the funds." Such a statement is hearsay, and wholly incompetent when the question comes up between employer and employé, and it is essential for the employé to establish a theft in order to relieve him from liability. The testimony was received under objection and exception. It is immaterial that Mr. Barnes, the president, believed what defendant told him. This neither bound the bank nor proved the theft. Furthermore, the money, if taken by the son, might have been taken under such circumstances as not to relieve defendant from liability, and upon this point there is an entire absence of proof. In order to avoid his voluntary agreement, entered into and accepted in good faith, and acted upon for a long period, the defendant now seeks to defend by proclaiming his son a felon, and to do so without giving his son a chance to be heard. Courts will not permit such a defense to be established by bare hearsay.

Judgment reversed, and new trial ordered.

MOORE, J., concurred with GRANT, C. J.

LONG, J. I think the case should be reversed upon the last point suggested by my Brother GRANT. I cannot agree with him, however, upon the other questions.

HOOKER, J., concurred with LONG, J.

MONTGOMERY, J. (*dissenting*). I think the testimony tended to show that the only consideration for defendant's promise was the assumed defalcation of the son of defendant. There was no extension of time as to him. There was no release of the son, no novation, and hence no legal consideration for defendant's promise.

The judgment should be affirmed.